Name:    Samuel Kidstar                                    Date: 1/8/2021

Address:  1509 6th St. North Bergen NJ 07047
Phone #:   (303) 317-7764
Email:      Kidstar27@yahoo.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Division of San Francisco


Samuel Kidstar                         Case No.20-ev-05408-SK

        (Plaintiff)

        Vs                             First Amend complaint


FACEBOOK INC.,et al.

    (Defendant)


To: The Honorable Judge Sallie Kim

Dear Judge Kim


I, Samuel Kidstar dropped the lawsuit against Mark Zuckerberg and I will only hold Facebook INC.et al liable for $125,000 dollars and I'm asking for a trial by jury.

The last time we had a zoom conference call on 11/2/20, your honorable Judge Kim asked me to Amend my Complaint and make a case. I made an Index for the Case for you like you asked to show a case that gives facts and legal argument with California State Law for motion not to dismiss the case and set it for trial..

# INDEX FOR CASE

(#1) Facts of the case

(#2) Fair Terms

(#3) Facebook is a scam

(#4) Transcripts of Emails from Facebook to Mr. Kidstar after receiving court papers.

(#5) Stipulation Extending asked by Facebook

(#6)  Facebook Phone number and contact information

(#7) Website trying to Contact Facebook (3,747 Complaints against them)

(#8) What is Fraud

(#9) California Laws and Related Facebook Lawsuits

(#10) Punitive Damages

(#11) Breach of Contract

(#12) Settlement and Relief Sought

# (#1) Facts of the case

The base of this case is simple. When you first sign up to use Facebook, you first must read and sign a "Terms of Service User Agreement" and there is no one to contact, like a customer support or a lawyers office to ask any questions before signing this contract.

Once signed, you're 100% on your own after that. If your account gets "Hacked", "Disabled", "Data Breached" or any other reason, there is absolutely no way to get a hold of Facebook to turn your account back on unless you sent them court papers.

There is nothing in there "Terms of Service User Agreement that explains this to the user before signing it. This is fraud by definition and misleading the user and not providing very important information before signing a contract. They must state that everyone's Facebook account is not secured and the user shouldn't give out any imported information.

Once you sign up to use their service, they immediately ask you to update your profile info.

(#1) Add your current home city.
(#2) Add your hometown.
(#3) Add your school.
(#4) Add your college.
(#5) Add your company.
(#6) Add your relationship status.
(#7) Add your Update picture.
(#8) Add your bio.
(#9) Add your family & friends.

Facebook is asking everyone for their personal information knowing that it's completely unsecured and every criminal in the world can access this information and Hack your account and when this happens, there is no one to get in contact with to resolve this major problem.

"When you sign up, Facebook reserves the right to use your information however it sees fit, as long as it is "in connection with the services and features" it provides. What "services" or "features" mean, well, take a guess. Bottom line: This section is extremely vague, and should make you wary about having a Facebook account at all. There is nothing in this section that tells you that your account can be hacked and you shouldn't give Facebook your personal information because when this happens, and it will eventually, you're on your own.'

Facebook is breaking the California State laws when it comes to protecting the user from being a victim and in a real sense, Facebook is helping the world's best criminals in providing them with all your information and putting you in harm's way.
Facebook is basically having you sing up and then leaving you completely vulnerable to having all your personal information stolen not only by criminals, but by their own company for a huge profit in the hundreds of billions. Facebook should have a warning label before you sign anything saying,...

"DON'T PUT ANY OF YOUR PERSONAL INFORMATION ON YOUR HOMEPAGE BECAUSE YOU WILL BE A TARGET FOR FUTURE HACKERS AND CRIMINAL ACTIVITY AND WHEN YOUR ACCOUNT SHUTS OFF, WE AT FACEBOOK COULD CARE LESS AND DO NOT HAVE A CUSTOMER SUPPORT TO HELP YOU OUT AND IF YOU WANT YOUR ACCOUNT TURNED BACK ON, YOU WILL HAVE TO SEND US COURT PAPERS THAT WILL COST YOU 10'S OF THOUSANDS OF DOLLARS, SO ENTER AT YOUR OWN RISK"

This is a warning label that Facebook can now show a judge and say,...:"We warned the user" Case Dismissed. But this is not to be found anywhere in the "Terms of Service User Agreement.

By not warning everyone that is signing up, they are being dishonest and leading you to the slaughterhouse. Over 60 million users have had their accounts, Hacked, shut off or disabled, Data Breach and many other reasons and have been left without answers or help in this matter. This is completely unacceptable and a "Breach of Contract"


# (#2) Fair Terms

The Terms need to be fair. This means that they must be reasonable, and not include any trickery or undue influence when they are agreed to. Facebook fails to inform the user of all the hazards and cons in signing up to their website and fails to tell everyone that signs there Terms that they don't have customer support and will not help you unless you send them court papers and then they are still not responsible if your account is compromised from Hackers, Data Breach or anything else.


# (#3) Facebook is a scam.

Facebook is a scam and doesn't have a case.

Once you sign that user agreement Facebook believes that they can sell your personal information for a hug profits and when your account is Compromised, Hacked or a Data Breach were all your personal information was stolen by professional criminals, that there not responsible because you signed the User Agreement that failed to explain any of this to you.

If their Terms of Use is valid, then when I sent them court papers, why did they try and help me get my account turned back on and get all my lost pictures back? At that point they should have told me that they are not responsible for my account being compromised and it would have saved me 10's of thousands of dollars.

It took them over a year to get my account turned back on and when they finally did, they told me to drop the case without any competition.

The only reason Facebook doesn't have a customer support phone number to call is because they wouldn't be able to handle the 10's of million of calls every year with all the Hacking and Data Breaching cases that go on. So it's better to ignore the problem and just ask a judge to throw the case out then having to deal with it.

They are committing fraud and misleading everyone who signs up with their website by not informing the User of all the Hazards and cons that come with signing up with them.

"Facebook is the world's biggest social network with 2.7 billion users and a company with a market value of nearly $800 billion whose CEO Mark Zuckerberg is the world's fifth-richest individual and the most public face of Big Tech swagger"

Facebook's website was designed to get all your personal information and sell it to add companies for a huge profit and nothing more.

# (#4) Transcipes of Emails from Facebook to Mr. Kidstar after receiving court papers

When my Facebook account was compromised in late 2017 by a criminal hacker who breach Facebook's security system, I couldn't get a hold of them. So I contacted a fake Facebook customer support team that robbed me of $450 dollars off my credit card. I went down to the F.B.I's office and they sent me to the D.A.'s office and the D.A.'s office couldn't get a hold of Facebook.

After sending two letters to the address that the D.A.'s office gave me. Facebook never answered or replied. So I then sent them court papers and they immediately got in touch with me. They sent countless hours trying to figure out what happened to my account. It took them over a year to turn it back on.

Facebook doesn't even know how their website works and had know idea what happened to my account, but they were willing to send time and money in trying to turn it back on when they should have just told me to go to hell right then and there after receiving court papers from me, but instead they spent over a year trying to figure out what happened costing my all my time and money in the process.

**Paven Malhotra** <pmalhotra@keker.com>
**To:**
kidstar27@yahoo.com
**Cc:**
Jordan C. Van Druff
Mon, Oct 16, 2017 at 1:30 PM

Mr. Kidstar,

Hope you are well. I am outside counsel for Facebook and was hoping to chat with you about your complaint and to determine if there is a way for us to resolve your account issue. Can you please let me know a convenient time to chat? You can also call my office. My number is 415 676 2238. I left you a voicemail this morning as well.

Regards, Paven

**Paven Malhotra** <pmalhotra@keker.com>
**To:** kidstar27@yahoo.com
**Cc:** Mark S. Pincus (mark@pincus-law.com)
,
FBXGEN-KVP
Mon, Nov 20, 2017 at 3:41 PM

Thanks Samuel. Facebook is actually trying to investigate what is happening with the photos on the account. As soon as they report back to me, I'll let you know.

You recently requested a copy of your Facebook data. We'll send you another email with a link to your download when it's ready. For security reasons, the link will only work for a few days after being sent, so please monitor your email for our message. If the link doesn't work by the time you read your email, you'll have to restart the download.

Learn what data may be in your download: https://www.facebook.com/help/405183566203254

If you didn't request a download of your information, your account may be compromised. Please visit the Help Center to secure it: https://www.facebook.com/help/203305893040179

Thanks, T**aven Malhotra** <pmalhotra@keker.com>

**To:**kidstar27@yahoo.com

**Cc:** mark@pincus-law.com

,FBXGEN-KVP

Sat, Nov 25, 2017 at 6:08 PM

Samuel,
Thank you for your email. As I mentioned, I'm trying to see if there is a way to identify what happened with your photos. You mention having a Samsung Galaxy 5. Can you provide a few other details, namely:

- What is the URL of your Facebook profile experiencing the issue?
-Is this issue occurring on web, mobile, or both?
-If web, which browsers? (Ex. Chrome, Safari)


As Mark mentioned, I'd like to do our best to investigate this issue and see if we can understand from a technical perspective what the situation is. Please let us know if we can extend the response deadline until January 5 so we can determine what is happening with the photos. I'm hoping that we can resolve the situation without further litigation.


Regards,
Paven

he Facebook Team

**Mark S. Pincus** <mark@pincus-law.com>

**To:** kidstar27@yahoo.com

**Cc:** Paven Malhotra

Tue, Jan 2, 2018 at 10:28 PM

Samuel, Facebook's engineers are still looking into your missing photo issue, but it will take a little more time.  They have done a significant amount of searching but have not yet seen any indication of the photo deletion. They are looking into a few more loose ends.  Can we agree to adjourn Facebook's time to answer your complaint until February 5?  If you do not agree to adjourn, we will be making a motion to dismiss your case on or before Friday, January 5.

Best,  Mark

**Cc:** Paven Malhotra

Tue, Feb 27, 2018 at 5:02 PM

Samuel, Thank you for your response.  I have cc'ed Paven on this and we will get back to you after we follow up with Facebook.  In the meantime, what are the email addresses/usernames associated with the two accounts?

Best,  Mark

**Mark S. Pincus** <mark@pincus-law.com>

**To:** kidstar27@yahoo.com

**Cc:** Paven Malhotra

Mon, Mar 5, 2018 at 3:20 PM

Samuel, Can we agree to another month extension (April 5)?  Facebook is investigating to see if they can recover the photos based on the information you gave us about your second account.

Best,  Mark

**Mark S. Pincus** <mark@pincus-law.com>

**To:** kidstar27@yahoo.com

**Mark S. Pincus** <mark@pincus-law.com>

**To:** kidstar27@yahoo.com

**Cc:** Paven Malhotra

Tue, Apr 17, 2018 at 3:20 PM

Samuel, Facebook has found your photos, but they are having trouble figuring out why you can't access them.  Have you tried to log into the Facebook account associated with kidstar24@yahoo.com?  The photos appear to be associated with that account.  Please let me know, so I can get back to Facebook.  If you can't access the photos from that account, they will try to figure out another solution.

 Best,  Mark

**Mark S. Pincus** <mark@pincus-law.com>

**To:** kidstar27@yahoo.com

**Cc:** PMalhotra@keker.com


Wed, Apr 18, 2018 at 8:32 PM

Samuel,

Good speaking with you before and thanks for the two-week extension.  I will send you a stipulation tonight or tomorrow, and will be in touch with alternate solutions, since you indicated you cannot access the photos through your account.

Best, Mark


**Mark S. Pincus** <mark@pincus-law.com>

**To:** kidstar27@yahoo.com

Thu, Apr 19, 2018 at 1:12 PM

Samuel, Please try these links again for the kidstar24@yahoo.com Facebook account and let me know if they work:

 "only me":

[2011] https://www.facebook.com/samuel.kidstar/media_set…

[2012] https://www.facebook.com/samuel.kidstar/media_set…

friend privacy:

[2011] https://www.facebook.com/samuel.kidstar/media_set…

[2010] https://www.facebook.com/samuel.kidstar/media_set…

[2011] https://www.facebook.com/samuel.kidstar/media_set…

[2011] https://www.facebook.com/samuel.kidstar/media_set…

[2012] https://www.facebook.com/samuel.kidstar/media_set…

[2014] https://www.facebook.com/samuel.kidstar/media_set…

[2010] https://www.facebook.com/samuel.kidstar/media_set…

[2013] https://www.facebook.com/samuel.kidstar/media_set…

# This is where I got a lawyer Stephanie McClure to take over. She charged me $10,000 dollars up front and $400 an hour after. She would handle all court costs and talks with Facebook.

On Monday, July 16, 2018, 2:08:14 PM EDT, STEPHANIE MCCLURE <stephanie@mglawgroup.com> wrote:

Mark wants to talk about settlement - which is good news.

I told him to come up with a respectable financial number to compensate you for your emotional loss and financial loss from your book, on top of giving you a thumb drive with all your photos on it. He is going to get back to me.

While he gets that together, you and I need to discuss what settlement figure would be acceptable to you. I have temporarily paused our plan to file in NJ to allow these talks to happen because it's in your best interest! This is the part where you may actually get compensated!

As I've said, your case has some legal obstacles... especially including the fact that when you opened Facebook, their terms you had to accept  technically limited any lawsuit to a total settlement of $100 dollars. Obviously we are trying to work around that. But I think if they agree to give you some amount of money back toward your lawyer fees and all your photos, you should consider it. The reason being, the only way to get more is to go all the way to trial, which could rack up a legal bill for me of 30,000 or more... and a jury could end up giving you zero.. or $100. In that case, I am the only one who wins and that's not fair to you.

So, overnight, please think of the amount of money that would make you happy to settle this case and let me know. If Pincus does not agree... then we will continue in NJ.

Stephanie

**stephanie mcclure** <stephanie@nycnjlawyer.com>

**To:** kidstar27@yahoo.com

Tue, Aug 18, 2020 at 5:22 PM

Hi Sam! I reviewed the last paper you sent to me.

Here is what it means.  You should put these dates in your calendar.   Take a look at the stuff below and let me know your thoughts. I will help you with the first step of dealing with this order and entering your appearance (or my appearance) for this installment of $2000.

There is still **a lot** of work to be done after that though.  You are going to want to consider hiring me again outright if you have access to the funds.  There is a ton of work to do and I can see they are getting ready to file motions to dismiss again.  You need to Amend the complaint and also be prepared to write these motions to dismiss oppositions.   I can Amend the complaint, do the below steps, and handle the motion to dismiss for $15,000 .   Let me know your thoughts.  That will save you money in the long run paying up front rather than in small clips for task based work.  Again, take a look at the next few items and let me know what you think.

# (#5) Stipulation Extending asked by Facebook

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

SAMUEL KIDSTAR                                  STIPULATION EXTENDING

    (Plaintiff)                                        IndexNo. 101267/2017

      Vs

FACEBOOK HQ

   (Defendant.)

STIPULATION EXTENDING
TIME TO ANSWER, MOVE
OR OTHERWISE RESPOND

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned

Counsel that Defendant's time to answer, move, or otherwise respond to the Complaint is hereby

(#1) Extended from October 19th, 2017 --to-- November 17th, 2017.

(#2) Extended from November 7th, 2017 --to-- December 1st, 2017

(#3) Extended from November 27th, 2017 --to-- January 5th, 2018

(#4) Extended from January 3rd,2018 --to-- February 5th, 2018

(#5) Extended from February 1st, 2018 --to-- March 5th, 2018

(#6) Extended from March 5th, 2018 --to-- April 5th, 2018

(#7) Extended from April 4th, 2018 --to-- April 19th, 2018

(#8) Extended from April 19th, 2018 --to-- May 3rd, 2018

At this point in the case, I got a lawyer Stepanie McClure and paid her $10,000 dollars up front and she took over the case. Facebook then began playing games with her and she started giving them move Entened Stipulations from May 2018 to January 2019 when they finally turned my Facebook account back on, over 15 months from receiving NY Supreme Court Paper.

# (#6) Facebook Phone Number & Contact Information

## Contacting Facebook Customer Service Center

Facebook is the king of social media. With security problems and recently going public as a company, Facebook has been all over the news. Contacting Facebook corporate is a bit harder than we expected. There is no true customer service for the service because Facebook. We found contact information for Facebook corporate offices via court documents filed against the company.

## Contact Info:

### Phone Contact Numbers

If you want to contact Facebook by phone you may have a bit of trouble getting through, according to some customers. Facebook does not list corporate or customer service contact information on the official Facebook page as they request contact be made via their business Facebook page.

- Facebook Headquarters: 1-650-543-4800

### Mailing Address

The mailing address for Facebook customer service is another piece of hidden information. It cannot be accessed easily from Facebook.com, but we did find the corporate address on a legal document.

Facebook Corporate Office

1601 S. California Ave.

Palo Alto, CA 94304

### Official Website

The official website for Facebook is http://www.facebook.com. You can also access information about the company at http://www.facebook.com/facebook/, which is the Facebook page for Facebook. The website offers social media accounts for businesses and individuals. Business accounts can be set up to sell items directly from the page using apps provided by companies other than Facebook.

# (#7) Website trying to Contact Facebook (3,747) Complaints against them

# https://www.contactcustomerservicenow.com/contact-facebook-customer-service/

3,743 Comments on "Contact Facebook Customer Service from 2012 to 2020"

# There have been over 60 million users who have had their Facebook accounts Hacked, Data Breach or disabled over the years with no way of contacting Facebook to solve the problem.

I don't have the time to show you all of the 3,747 complaints, you can go on their website https://www.contactcustomerservicenow.com/contact-facebook-customer-service/ but here are 15 complaints. All the complaints are almost all the same. Their accounts just locked them out, hacked or lost access to their accounts and they can't get a hold of anyone. "Please help"

(#6) renu says:

July 14, 2012 at 9:42 am

my personal facebook has been disabled how can i get it back..i had so many emailed them n got linked bt does not work..pls help me to reactivate my account

(#15)  bishnu bhakta tiwari says:

August 22, 2012 at 5:20 am

my old face book which was lost since an year is hacked and its missused! i tried a lots to open it but the yahoo id is changed by the hacker so i cannot find it and the password reset code goes in that yahoo id of hacker so i m helpless.now that facebook is used as bishnu tiwari as a user name nd had kept a relative girl's photo by joining with my pic in profile! the girls family are planning for the police case from the u.s!i tried a lots to open that but unable.My every effort became effortless nd i cant get that coz the internal shetting of that facebook is changed!help me to get regid of this haker.

(#17) peejay says:

August 23, 2012 at 5:37 pm .somebody was trying to access my account yesterday morning here is the posted data, can you please help me identify the IP address or the computer that person who is trying to hack my account is using?

(#1369) Arlene L. Powers says:

May 22, 2015 at 9:56 pm

I need to get my facebook posts back in October. everything is gone just new ones comes in the old ones goes Why? I need to save them but won't allow me to. Please contact me via email. I am still charging my phone. I need to see all of my posts with pictures back in October-November 2014. I need some information. Please contact me asap.

(#1378) Alysa says:

June 3, 2015 at 8:27 pm

Someone has used my email address and it's not even in my language. Please close this account down. Thanks

(#2427) Micheal A Swan says:

March 12, 2017 at 3:38 pm

Your customer service is absolutely the worst I have come across in 58 years.

How your faceless company has grown to be so large is beyond me. I have tried unsuccessfully to delete one account while keeping the other open. Hasn't happened.

Tried to reset my password as it somehow mysteriously disappeared when none of my other saved ones did. Was told I was being texted a new one in a few minutes. Have waited, thank God not holding my breath, for hours and still nothing.

I guess that is what to be expected from a bunch of spoiled brats playing at running a company.

If your boss makes the ridiculous mistake of running for a government office you may rest assured I and many others will proceed with any and all legal avenues to make sure that doesn't happen.

(#2433) Dave says:

March 18, 2017 at 2:02 am

This is not the first time you you have locked me out of my account Why do you do this? You ask for security questions that I have never heard of. You put me through security loops that are useless and frustrating. Is this your idea of funny?

Frustrated and Upset!

(#2527) Jermaine Jakes says:

July 26, 2017 at 11:31 am

My account is locked and I don't know why, someone sent me an app, I tapped it, and it was a virus, to stop the app I changed my password, now it will not let me log in at all…

(#2678) bill werner says:

October 16, 2017 at 4:14 pm

I some how messed up my account, I cant get on my account so I made a new one and I'm having problems there to, can you help me get on my first account?

(#2993) april says:

April 29, 2018 at 4:53 pm

someone changed my password HELP

(#3337) Charles Tomlin says:

November 12, 2018 at 12:09 pm

Hello I have unable to get on my Facebook page for 7 days and messenger for 2 weeks no response from Facebook at all.

Thank you

CharlesTomlin

charlestomlin28@gmail.com

(#3403) Michelle Sanders says:

January 8, 2019 at 9:36 pm

Facebook, I have tried several times to log into my account. I need your assistance, it will not give me access for code generators. I reads to many times. Thank you for your time

(#3411) jo wilsdorf says:

February 21, 2019 at 2:23 pm

Well, for number 1 your customer service is lousy. I cannot log into my facebook account and have tried all the different directions you posted. Please help

(#3460) Johnny Boswell says:

October 16, 2019 at 1:33 am

My name on fb is johnny Carolyn Boswell I went to check my fb and it said my session has timed out. LOg in again and when I try tryed it's says wrong password I no longer have aces to the email that is attached with fb so I can ant received a code pleese help me i have been trying for days

(#3569) Payel Adak says:

December 5, 2020 at 1:34 pm

dear facebook team my facebook account has been hacked since 2nd november 2020. hacker also changed my email address and phone number from my account, i tried to recover but i can't recover my facebook account. and the hacker posting from my account right now. please help me to recover my account. here is my all details of my facebook account.

register email- payeladak5@gmail.com

old Password – 74799382

mobile no- +919382063839

facebook profile link- https://www.facebook.com/payel.adak.904

**Facebook is clearly not a safe website and is asking the user to give them all your personal information so the world's best criminals have access to your information and when the user gets hacked or account disabled, there is no way to get a hold of Facebook.**

# (#8) What is Fraud

**WHAT IS FRAUD?**

Fraud is using deceit or dishonest means for the purpose of depriving another of money, property or a legal right.

This article discusses types of fraud, pleading and proving the elements thereof.

Civil fraud, deceit and misrepresentation are defined in *Civil Code* Sections 1709, 171.0, 1572 and 1573.

## WHAT CONSTITUTES FRAUD IN CALIFORNIA

In California, a cause of action for fraud can arise when a party misrepresents material facts, makes false promises, or otherwise deceives another party with the intention of depriving them of their money, property, and/or rights. Fraud and deceit are generally defined in California Civil Code Sections 1572, 1709, and 1710. Following are the types of fraud claims permitted under California law.

## Fraud

Fraud is the legal term for lying to someone. In order to succeed in a suit for fraud, plaintiffs generally have to prove:

- The company knew what they said was false.
- The company knew the other person would believe them.
- The other person would rely on that information that a company gave them.

- The other person would be harmed by relying on this information that a company gave them.

## (#9) California Laws and Related Facebook Lawsuits

### Consumer Protection in California for Data Use and Data Theft (Senate Bill 1386)

# Judge lets Facebook privacy class action proceed, calls company's views 'so wrong'

By Jonathan Stempel

(Reuters) - A federal judge on Monday ordered Facebook Inc FB.O to face most of a nationwide lawsuit seeking damages for letting third parties such as Cambridge Analytica access users' private data, calling the social media company's views on privacy "so wrong."

While dismissing some claims, U.S. District Judge Vince Chhabria in San Francisco said users could try to hold Facebook liable under various federal and state laws for letting app developers and business partners harvest their personal data without their consent on a "widespread" basis.

He rejected Facebook's arguments that users suffered no "tangible" harm and had no legitimate privacy interest in information they shared with friends on social media.

"Facebook's motion to dismiss is littered with assumptions about the degree to which social media users can reasonably expect their personal information and communications to remain private," Chhabria wrote. "Facebook's view is so wrong."

The case is In re Facebook Inc Consumer Privacy User Profile Litigation, U.S. District Court, Northern District of California, No. 18-md-02843

**PLEADING FRAUD / MISREPRESENTATION IN A COMPLAINT:**

In California, fraud must be pled in the complaint specifically.  General and conclusionary lusory allegations are not sufficient. (*Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 74; *Nagy v. Nagy* (1989) 210 Cal.App.3d 1262, 1268)

Unlike most causes of action where the "the policy of liberal construction of the pleadings," fraud requires particularity, that is, "pleading facts which show how, when, where, to whom, and by what means the representations were tendered."

(*Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 73; *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.)

Every element of a fraud cause of action must be alleged both factually and specifically. (*Hall v. Department of Adoptions* (1975) 47 Cal.App.3d 898, 904; *Cooper v. Equity General Insurance* (1990) 219 Cal.App.3d 1252, 1262.)

In a case where misrepresentations are repeated often, the plaintiff must at least allege a representative selection of the misrepresentations sufficient enough for the trial court to ascertain if the statements were material and actionable. (*Goldrich v. Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th 772, 782-783; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216 and 218.)

Less specificity and particularity is required when the allegations indicate that the defendant necessarily possesses full information concerning the facts of the controversy or "when the facts lie more in the knowledge of the opposite party ...." (*Bradley v. Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 825; *Turner v. Milstein* (1951) 103 Cal.App.2d 651, 658; *Committee On Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216-217.)


**PROVING FRAUD / MISREPRESENTATION:**

**DECEIT OR INTENTIONAL FRAUD**

The tort of deceit or intentional fraud requires that each and all of the following elements be proved:

"(a) misrepresentation (false representation, concealment, or nondisclosure);

(b) knowledge of falsity (or 'scienter');

(c) intent to defraud, i.e., to induce reliance;

(d) justifiable reliance; and

(e) resulting damage."

(*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974; See also *Gonsalves v. Hodgson* (1951) 38 Cal.2d 91,

100-101; *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 512.)

The representation must normally state a fact rather than an opinion. Puffing or sales talk is generally considered an opinion (unless dealing with product safety). *(Hauter v. Zogarts (1975) 14 Cal.3d 104, 112)*.

A misrepresentation may be verbal, written or implied by conduct." *(Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1567.)

"…false representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered." (*Yellow Creek Logging Corp. v. Dare* (1963) 216 Cal.App.2d 50, 55.)

"Causation requires proof that the defendant's conduct was a 'substantial factor' in bringing about the harm to the plaintiff." (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132.)

## What is the Facebook data privacy scandal?

The Facebook data privacy scandal centers around the collection of personally identifiable information of "up to 87 million people" by the political consulting and strategic communication firm Cambridge Analytica. That company--and others--were able to gain access to personal data of Facebook users due to the confluence of a variety of factors, broadly including inadequate safeguards against companies engaging in data harvesting, little to no oversight of developers by Facebook, developer abuse of the Facebook API, and users agreeing to overly broad terms and conditions.

## What is the timeline of the Facebook data privacy scandal?

Facebook has more than a decade-long track record of incidents highlighting inadequate and insufficient measures to protect data privacy. While the severity of these individual cases varies, the sequence of repeated failures paints a larger picture of systemic problems.

In 2005, researchers at MIT created a script that downloaded publicly posted information of more than 70,000 users from four schools. (Facebook only began to allow search engines to crawl profiles in September 2007.)

In 2007, activities that users engaged in on other websites was automatically added to Facebook user profiles as part of Beacon, one of Facebook's first attempts to monetize user profiles. As an example, Beacon indicated on the Facebook News Feed the titles of videos that users rented from Blockbuster Video, which was a violation of the Video Privacy Protection Act. A class action suit was filed, for which Facebook paid $9.5 million to a fund for privacy and security as part of a settlement agreement.

## WHY THE FTC SUED FACEBOOK IN 2012

In 2012, the FTC charged Facebook with eight separate privacy-related violations, including that the company made deceptive claims about consumers' ability to control the privacy of their personal data. One specific count alleged that Facebook allowed users to choose settings that supposedly limited access to their information just to "friends" without adequate disclosures that another setting allowed that same information to be shared with the developers of apps those friends used. Put another way, suppose Consumer A restricted access to friends and designated Consumer B as a friend. If Consumer B used a particular app on Facebook – let's say a game – the game developer could access information about Consumer A, including data designated as private. That was all going on behind the scenes without a clear disclosure to Consumer A and in flagrant disregard of that person's privacy choices.

To settle that case, Facebook agreed to an order that, among other things: 1) prohibited Facebook from making misrepresentations about the privacy or security of consumers' information, 2) prohibited Facebook from misrepresenting the extent to which it shares personal data, and 3) required Facebook to implement a reasonable privacy program.

According to the FTC, Facebook flouted that order in multiple ways, and today's settlement holds them accountable for putting profits over their privacy promises.

## HOW FACEBOOK VIOLATED THE 2012 FTC ORDER AND THE FTC ACT

Under the 2012 order, Facebook must honor consumers' privacy choices or face an order enforcement action, which can result in substantial civil penalties not legally available to the FTC in an initial lawsuit. The FTC alleges that since agreeing to that settlement, Facebook repeatedly misrepresented the extent to which users could control the privacy of their data.

You'll want to read the new complaint for details, but here are a few examples of how the FTC alleges Facebook violated the order. After agreeing to the 2012 settlement, Facebook launched services with feel-good names like "Privacy Shortcuts" and "Privacy Checkup" that claimed to help users manage their settings and limit who had access to their data. Concerned about their privacy, many consumers used those new tools to limit access just to friends.

But according to the FTC, even if people chose the most restrictive settings those tools allowed, Facebook made consumers' personal data accessible to companies that developed apps used by consumers' friends. To name just a few categories, that included the news and books they were reading, their relationship details, their religious and political views, their work history, their photos, and the videos they watched. Facebook did offer a setting to ensure users' privacy preferences would be honored, but it was hidden away in a place people were unlikely to look. And it wasn't directly accessible from the very tools the company touted as the way for consumers to "review and edit the privacy of key pieces of information."

Furthermore, at the 2014 F8 conference – a gathering of companies that build products and services around Facebook – Facebook announced that it was no longer allowing third-party developers to collect data about the friends of app users. However, Facebook was separately telling developers with existing apps on the platform that they could continue to collect friends' personal data for another year. And even after that period elapsed, Facebook continued to provide certain developers with access to friend data for years to come. The FTC says it took Facebook until at least June 2018 to stop providing access to this data to certain third-party apps.

Another way the FTC says Facebook violated the order was by failing to adequately assess and address privacy risks posed by third-party developers. Other than getting developers to click an "I agree" terms-and-conditions box when registering an app with the Facebook Platform, Facebook didn't screen developers or their apps before giving them access to massive amounts of data that users had designated as private. Of course, in the wrong hands, information like that can grease the wheels for identity thieves and fraudsters. One particularly troubling charge is that when Facebook learned that app developers were violating Facebook's terms, Facebook's enforcement action was often influenced by how much advertising money the app developer spent with Facebook. Just how much user data was improperly disclosed? Facebook's poor recordkeeping makes that difficult to determine.

According to the complaint, another way Facebook misrepresented the extent to which users could control the privacy of their data related to a form of technology that raises particular concerns for many

consumers: facial recognition. In an April 2018 update to its Data Policy, Facebook represented to consumers, "Face recognition: If you have it turned on, we use face recognition technology to recognize you in photos, videos and camera experiences." The complaint alleges that this statement was deceptive to tens of millions of users who have Facebook's facial recognition setting, "Tag Suggestions," because that setting was turned on by default and the updated Data Policy suggested that users would need to opt-in to having facial recognition enabled for their accounts.

In addition, the complaint charges Facebook with a new violation of the FTC Act. You know how Facebook asks users for their mobile phone number to help secure their accounts or reset their passwords? According to the complaint, Facebook didn't tell people it also used that phone number to serve them with ads.

It boils down to this. In the face of consumers' intent to limit information-sharing to a select few, Facebook ignored them and shared it broadly. Facebook did that despite its privacy promises, despite consumers' efforts to protect their privacy, and despite the terms of the 2012 order. Why? To further Facebook's financial interests.

# HOW THE NEW ORDER WILL CHANGE FACEBOOK'S APPROACH TO CONSUMER PRIVACY

The $5 billion civil penalty is the largest ever imposed on a company anywhere for violating consumers' privacy. What's more, the penalty – which, by law, goes to the U.S. Treasury (not the FTC) – is one of the largest penalties ever assessed by the U.S. government for any violation. It's designed to make all companies – not just Facebook – sit up, take notice, and rethink their practices.

Could the FTC have won a bigger civil penalty by going to court? Probably not. Judges tend to evaluate financial remedies in comparison with cases that have gone before it. That's why we think the financial settlement is in the public interest. It has the added benefit of establishing a new benchmark when the FTC challenges privacy violations in the future.

The order imposes additional requirements to address Facebook's illegal conduct. For example, Facebook must implement a stringent program to monitor third-party developers and terminate access to any developer that doesn't follow the rules. In addition, Facebook can't use for advertising purposes the phone numbers it obtained specifically for security. When it comes to facial recognition technology, the order requires Facebook to give clear notice of how it uses that information and it must get consumers' express consent before putting that data to a materially different use. Facebook also will have to encrypt

passwords and can't ask people for their passwords to other services, and must report any privacy incident to the FTC within 30 days. On top of everything Facebook will have to do to protect consumers' privacy, it also has to implement a comprehensive data security program. Another important consideration: These new accountability provisions don't just apply to Facebook. They also apply to companies Facebook controls, like Instagram, WhatsApp, and other Facebook-owned affiliates that it shares consumers' information with between now and 2039.

But don't let a focus on the record-setting financial and conduct remedies distract from just how monumental a change the order imposes on Facebook's privacy ecosystem and CEO Mark Zuckerberg's job description. The order explains in detail a new system of independent control, multi-layer accountability, and personal responsibility over Facebook's practices, and substantially limits Mr. Zuckerberg's unfettered say in privacy decisions. In fact, for the next 20 years, anytime Facebook makes a privacy decision, multiple independent watchdogs will be looking over its shoulder. You'll want to read the order in depth, but here are some highlights of ways that business is about to change at Facebook.

**Who will oversee privacy at Facebook? An Independent Privacy Committee.** Facebook's Board of Directors will name a new subgroup that will serve as an Independent Privacy Committee. Facebook officers and employees – including Mr. Zuckerberg – are disqualified from membership. The Committee will be briefed about all material privacy risks and issues at the company, and has approval-and-removal authority over a new cadre of designated compliance officers and a third-party assessor that will not answer to Facebook. (More about them in a moment.)

**Who will carry out Facebook's day-to-day privacy program? Designated compliance officers.** Expert compliance officers, who must be approved by the Independent Privacy Committee, will implement and maintain Facebook's privacy program. The compliance officers will be responsible for documenting every material privacy decision in detail. They'll provide that documentation quarterly to the third-party assessor and CEO Zuckerberg. They also will have to certify quarterly to the FTC that Facebook is complying fully with the privacy program. If that's not the case, the compliance officers will throw a flag that triggers even closer FTC scrutiny. In addition, the independent assessor will meet with the Independent Privacy Committee four times a year outside the presence of Facebook officers and employees. What if Facebook doesn't like what the compliance officers are doing? Tough. Only the Independent Privacy Committee can remove them from the job.

**Who else will be watching Facebook? A third-party assessor with broad monitoring powers.** The assessor – who must be appointed with FTC approval – will provide an independent evaluation of Facebook's privacy practices every two years. The order mandates that the assessor must subject Facebook to substantial scrutiny and can't just take management's word for what's happening. In effect, the assessor must kick the tires, look under the hood, put it up on the lift, conduct diagnostics, and take it for a test drive. And again, Facebook will not be able to remove the assessor on its own.

**How much of a role will CEO Mark Zuckerberg play in making final privacy decisions for the company? Substantially less, but he'll have much more on the line personally.** Mr. Zuckerberg will get a copy of Facebook's written privacy program and quarterly reports of privacy decisions. But he does not control the Independent Privacy Committee, the designated compliance officers, or the third-party assessor. However, the order does impose a major requirement on him. Facebook's CEO must certify quarterly to the FTC that the company's privacy program complies with the order. A false certification could trigger civil or even criminal penalties.

**How much access will the FTC have to Facebook's privacy decisions? An unprecedented amount.** The order gives the FTC unparalleled access to Facebook's decision-making. Upon request, the FTC will get written documentation of every privacy decision Facebook makes and copies of the third-party assessor's reports. (Remember that the FTC has to approve who gets hired as the assessor.) The order also includes tools that slice through any red tape that could have hindered the FTC's ability to get records, conduct interviews, or take other steps to monitor Facebook's compliance.

The goal of the FTC's settlement is the creation of a new culture at Facebook where the company finally lives up to the privacy promises it has made to the millions of American consumers who use its platform.

SECTION 2

Facebook was a class-action lawsuit in the United States District Court for the Northern District of California **regarding internet privacy and social media**. In December 2007, Facebook **launched Beacon**, which **resulted in users' private information being posted on Facebook without the users' consent**.

Filed 9/26/17

CERTIFIED FOR PUBLICATION COURT OF APPEAL,

FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

FACEBOOK, INC.,
Petitioner,
v.
THE SUPERIOR COURT OF SAN
DIEGO COUNTY,
Respondent;
D072171
(San Diego County
Super. Ct. No. SCD268262)
LANCE TOUCHSTONE,
Real Party in Interest.
ORIGINAL PROCEEDING
S
in mandate
challenging an order of the Superior
Court of San Diego County,
Kenneth K. So
, Judge.  Petition
Granted Perkins Coie LLP, James G. Snell and
Christian Lee for Petitioner.
No appearance for Respondent.
Office of the Alternate Public Defender,
Megan Marcotte, Chief Deputy Alternate
Public Defender, and Katherine I. Tesch, Deputy Alternate Public Defender, for Real
Party in Interest.

Fteja v. Facebook, Inc.,2012 WL 183896 (S.D.N.Y. Jan. 24, 2012). Fteja's initial "complaint" (filed as an order to show cause). If I could wave a magic wand, I'd retire the phrases "clickwrap" and "browsewrap." Those terms trace their lineage to a radically different technology–plastic shrinkwrap on physical products–and, as a result, they never developed clean or precise definitions in the online world. This opinion is much more prolix than necessary because the court couldn't figure out what either term meant and therefore couldn't decide how to apply the precedent. Fortunately, the court gets to the right place eventually.

Fteja claims that Facebook terminated his Facebook account improperly my paper about online user account terminations and 47 USC 230(c)(2) and Young v. Facebook.

For now, after removing the case from New York state court to federal court, Facebook sought to transfer the case to its home court in California. Facebook invoked the venue selection clause in its user agreement (its "Terms of Use"). Facebook uses a mandatory non-leaky clickthrough agreement where the terms are hyperlinked from the clickthrough page. (The language says: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service," where the words Terms of Service are a hyperlink). This user interaction should have made it an easy case. This formation process (mandatory clickthrough with hyperlinked terms) has been upheld in dozens of cases. Indeed, buried in his overlong discussion, the judge says "Fteja was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences. That was enough."

Yet, the judge launches into an extended discourse about the philosophy of online contracts. Overly troubled by the hyperlinked presentation of the actual terms, the court reaches this awkward classification:

> Facebook's Terms of Use are somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click "Sign Up"—to assent to the hyperlinked terms. Yet, unlike some clickwrap agreements, the user can click to assent whether or not the user has been presented with the terms.

The judge then snarks about social media exceptionalism:

> it is tempting to infer from the power with which the social network has revolutionized how we interact that Facebook has done the same to the law of contract that has been so critical to managing that interaction in a free society. But not even Facebook is so powerful.

(Don't underestimate Facebook, your honor. It is changing our brains).

Despite all the navel-gazing, the judge realizes:

> There is no reason why that outcome should be different because Facebook's Terms of Use appear on another screen rather than another sheet of paper....The mechanics of the internet surely remain unfamiliar, even obtuse to many people. But it is not too much to expect that an internet user whose social networking was so prolific that losing Facebook access allegedly caused him mental anguish would understand that the hyperlinked phrase "Terms of Use" is really a sign that says "Click Here for Terms of Use." So understood, at least for those to whom the internet is in an indispensable part of daily life.

Other Facebook Lawsuits.

# Multiple Lawsuits Already Filed Against Facebook Over Data Issues

MENLO PARK, CA — Facebook Inc. has been hit with four lawsuits in federal court in San Francisco and San Jose thus far this week in the wake of revelations that a political data firm obtained information about 50 million Facebook users.

## The Supreme Court in Douez v Facebook, Inc ([2017 SCC 33](#))

**SALEM, Ore**. — Both California and Oregon have joined a massive, multi-state lawsuit against Facebook, alleging that the corporation has illegally stifled competition to protect its monopoly power in the tech sector.

## U.S. government and 48 state attorneys general files lawsuit against Facebook

Updated Dec 9, 2020 at 4:04 PM

The U.S. government and 48 state attorneys general filed wide-ranging antitrust lawsuits against Facebook on Wednesday. The twin lawsuits filed in federal district court chiefly challenge Facebook's acquisition

of two companies: Instagram, a photo-sharing tool, and WhatsApp, a messaging service.

# (#10) Punitive Damage

**PUNITIVE DAMAGES UNDER CALIFORNIA LAW**

In California, punitive damages are generally available, in non-breach of contract cases,[2] when a plaintiff has proven by clear and convincing evidence that the defendant acted with "oppression, fraud, or malice[.]"[3]

(a) How reprehensible was that defendant's conduct? In deciding how reprehensible a defendant's conduct was, you may consider, among other factors:

 1. Whether the conduct caused physical harm;

 2. Whether the defendant disregarded the health or safety of others;

 3. Whether [*name of plaintiff*] was financially weak or vulnerable and the defendant knew [*name of plaintiff*] was financially weak or vulnerable and took advantage of [him/her];

4. Whether the defendant's conduct involved a pattern or practice; and

5. Whether the defendant acted with trickery or deceit.

(b) Is there a reasonable relationship between the amount of punitive damages and [*name of plaintiff*]'s harm [or between the amount of punitive damages and potential harm to [*name of plaintiff*] that the defendant knew was likely to occur because of [his/her/its] conduct]?

(c) In view of that defendant's financial condition, what amount is necessary to punish [him/her/it] and discourage future wrongful conduct? You may not increase the punitive award above an amount that is otherwise appropriate merely because a defendant has substantial financial resources. [Any award you impose may not exceed that defendant's ability to pay.]

[Punitive damages may not be used to punish a defendant for the impact of [his/her/its] alleged misconduct on persons other than [*name of plaintiff*].]

[4] *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13.

[5] *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65.

[6] *Adams v. Murakami* (1991) 54 Cal.3d 105, 112.

[7] *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 916-918; *Adams*, 54 Cal.3d at p. 119.

[8] *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1282-1284.

[9] *Philip Morris USA v. Williams*, 549 U.S. 346, 352 (2007)

[10] See Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit §

5.5 (2017):

# Punitive Damages – California Civil Code 3294

## Oppression, Fraud, or Malice

Under California Civil Code 3294, a plaintiff may be awarded punitive
damages if there is clear and convincing evidence that the defendant
in their case is guilty of:

1. Oppression
2. Fraud, or
3. Malice.

Punitive damages are **damages awarded to a plaintiff in order to punish the defendant for particularly egregious conduct**. California Civil Code 3294 allows for punitive damages where the defendant acted with malice, oppression or fraud, typically in cases of intentional harm or extreme recklessness.

## Legal references:

1. California Evidence Code §115.
2. In re Angelia P. (1981) 28 Cal.3d 908.
3. California Civil Code § 3295(e); also see § 3294 ("(a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. (b) An employer shall not be liable for damages pursuant to subdivision (a), based upon

acts of an employee of the employer,
unless the employer had advance
knowledge of the unfitness of the
employee and employed him or her with
a conscious disregard of the rights or
safety of others or authorized or ratified
the wrongful conduct for which the
damages are awarded or was personally
guilty of oppression, fraud, or malice.
With respect to a corporate employer,
the advance knowledge and conscious
disregard, authorization, ratification or
act of oppression, fraud, or malice must
be on the part of an officer, director, or
managing agent of the corporation.")

4.  California Civil Code Section 3295.

5.  See Adams v. Murakami (1991) 54
    Cal.3d. 105.

6.  See California Civil Jury Instructions
    (CACI) 3940 and 3947.

7.  Same.

8.  Cooper Industries, Inc. v. Leatherman
    Tool Group, Inc. (2001) 532 U. S. 424.

9.  State Farm Mut. Automobile Ins. Co. v.
    Campbell (2003) 538 U.S. 408.

10.   BMW of North America, Inc. v. Gore
      (United States Supreme Court, 1996)
      517 U. S. 559; Simon v. San Paolo U.S.
      Holding Co. (California Supreme Court,
      2005) 35 Cal. 4th 1159.

11.   State Farm, supra, endnote 9.

(#11) Breach of Contract

# What are the Available Damages in a California Breach of Contract Case?

California recognizes two main types of damages for breach of contract. These are **general damages** and **special damages**.

Punitive Damages

California courts do not recognize a right to punitive or exemplary damages for breach of contract, unless the breach occurs in connection with an intentional tort.

"An intentional tort is a category of torts that describes a civil wrong resulting from an intentional act on the part of the tortfeasor (alleged wrongdoer). The term negligence, on the other hand, pertains to a tort that simply results from the failure of the tortfeasor to take sufficient care in fulfilling a duty owed, while strict liability torts refers to situations where a party is liable for injuries no matter what precautions were taken."

**Intentional torts** are a wrongful act that someone plans, carries out, and is fully aware of their actions.

An intentional tort is a category of torts that describes a civil wrong resulting from an intentional act on the part of the tortfeasor. The term negligence, on the other hand, pertains to a tort that simply results from the failure of the tortfeasor to take sufficient care in fulfilling a duty owed, while strict liability torts refers to situations where a party is liable no matter what precautions were taken.

# (#12) Settlement and Relief Sought

I'm asking for $125,000 dollars in this case. I have spent over $30,000 dollars in lawyers fees and process fees and have spent over 1,500 hours of my personal time over the past 4 years going down to the courthouse, F.B.I's & D.A.'s office. Spending time writing papers, researching laws and doing everything that the judges have asked of me.

I have shown "Beyond a Reason of Doubt" to your Honor that Facebook's Terms of Uses is not a fair term to sign up to because it really doesn't mention any Hazards or cons when signing up and this is a Breach of a Contract. They are clearly trying to "Deceive and Trick" you into believing that their website is safe and secure when it is anything-but.

Once Facebook got my court papers, they should have not helped me at all. But instead they spend countless hours and money trying to turn my account back on costing me 10's of thousands of dollars.

Your Honorable Judge Kim should find them responsible for misleading me into believing that they were trying to help me but were only playing games and they are responsible for Punitive Damages because Facebook is clearly committing fraud and being dishonest in the way they run their business.

This case could help 10's of millions of other Facebook users if Facebook is held accountable for their actions. They have been getting away with murder for so long it's beyond sicking.

"Let The Wickedness of The Wicked Come To An End"

Psalms 7:9

Thank you for your time      Samuel Kidstar      1/8/2021